NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 05a0301n.06
Filed: April 19, 2005

No. 04-3461

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

SHARON BARANICH, administratrix of            )
the estate of John R. Baranich, deceased,      )
                                               )
      Plaintiffs-Appellants,                  )
                                               )
                                               )   ON APPEAL FROM THE UNITED
v.                                             )   STATES DISTRICT COURT FOR THE
                                               )   SOUTHERN DISTRICT OF OHIO
JO ANNE B. BARNHART,                           )
                                               )
      Defendant-Appellee.                     )
                                               )

Before: COLE and GIBBONS, Circuit Judges; SCHWARZER, District Judge.[*]

**JULIA SMITH GIBBONS, Circuit Judge.** John Baranich filed an application for

disability benefits with the Social Security Administration. He alleged an inability to work due to

the effects of a heart condition and anxiety. His application for benefits was denied initially and

upon reconsideration. He then had a hearing before an administrative law judge (ALJ). The ALJ

determined that Baranich was not disabled, because he retained the capacity to work in a significant

number of jobs in the national economy. Baranich appealed to the Appeals Council of the Social

Security Administration; it declined his request for review of the ALJ's decision. He then sought

judicial review of the decision, and the district court affirmed the denial of benefits. Baranich filed

a timely appeal. For the following reasons, we affirm the district court's decision.

---

[*]The Honorable William W Schwarzer, Senior United States District Judge for the Northern
District of California, sitting by designation.

I.

Baranich filed an application for Disability Insurance Benefits with the Social Security Administration on February 9, 2001. In that application, he alleged that he had been unable to work due to his disabling condition beginning May 8, 1999.[1] Baranich stated that his ability to work was limited due to the effects of a quadruple bypass and other heart conditions.

Baranich's application for benefits was denied initially and upon reconsideration. He then appeared at a hearing before an ALJ. Baranich, his wife Sharon, and independent vocational expert Timothy Mahler testified at the hearing. The key evidence before the ALJ was as follows.

A.

Baranich suffered a heart attack in September 1998 and underwent quadruple bypass surgery. After his heart attack, he was under the care of cardiologist Dr. William Noble.

In October 1998, Baranich reported to Dr. Noble that he had chest soreness, lightheadedness, numbness in the right leg, and trouble sleeping. On a return visit to his cardiologist in February 1999, Baranich stated that he would like to go back to work at the coal mine. He also reported dizziness and fatigue. However, by this appointment, Baranich had ceased rehabilitation.

On March 8, 1999, Dr. Noble saw Baranich again. At that time, he indicated that Baranich had no angina and a benign stress test; Baranich also denied heart failure, dyspnea, palpitations, and edema. They discussed Baranich's return to work. Dr. Noble wrote in his notes that "I asked him to have people help him [lift heavy objects]. . . . He has no specific restrictions."

Baranich's next visit with Dr. Noble was in August 1999. At that time, the doctor found no

---

[1]This was the date on which the coal mine where he worked shut down.

angina, dyspnea, palpitations, or edema. However, Baranich complained of a pulling feeling in his chest after mowing the lawn. Dr. Noble admonished him to not mow the lawn and diagnosed the pulling feeling as angina.

In October 1999, Baranich had good results on a stress test. However, Baranich reported that he had gone to the emergency room two weeks prior to the appointment upon feeling a dull distress in his chest. He believed that he had a case of the nerves and was given Ativan. Dr. Noble told Baranich not to shovel snow or do heavy yard work.

Baranich next saw Dr. Noble in September 2000. He was suffering from what Dr. Noble characterized as "rare angina" and what Baranich's wife described as part of a pattern of frequent angina. Dr. Noble gave Baranich nitroglycerin tablets to treat the angina; however, Baranich had only taken two tablets over the past year because nitroglycerin caused headaches for him.

In November 2000, Baranich reported to Dr. Noble that his chest was hurting constantly. He also reported that he was dizzy and nauseated and that his blood pressure dropped in the evening.

Baranich had an angioplasty in December 2000. After this procedure was performed, Baranich reported dizziness, lightheadedness, and weakness. At an appointment later that month, Baranich reported no angina, and a stress test on the treadmill went "quite well."

During appointments in the beginning of 2001, Baranich reported fatigue but no angina or chest pain. Additionally, the results of a March 2001 stress test were unchanged from the results of a stress test in February 1999.

In April 2001, Dr. Starr, a consultant for the government, reviewed Baranich's medical records. He determined that Baranich could occasionally lift fifty pounds, frequently lift up to

twenty-five pounds, stand and/or walk for about six hours in an eight hour workday, sit for about six hours in an eight hour workday, and push or pull with no limits. He also concluded that Baranich's allegations of symptoms were only "partially credible" as Baranich claimed that he became fatigued with minimal exertion, but stress tests showed that Baranich had a good capacity for exercise. Further, Dr. Starr found that Baranich could stand and walk normally, exercise, and perform household chores with little difficulty.

In April 2001, Dr. Hedges, one of Baranich's physicians, told Baranich to continue using nitroglycerin on an as-needed basis. However, Dr. Hedges noted that "he has not had any chest pain and has had no need to use the Nitroglycerin."

In May 2002, Dr. Noble wrote to Baranich's attorney. He stated, "He has serious heart disease. He is status-post myocardial infarction and bypass. . . . His job has required great labor. It is not prudent for him to do such effort with this degree of coronary disease."

B.

Baranich also suffered from anxiety, dating back to the 1970s. At the request of the Ohio Bureau of Disability Determination, Baranich saw David Bousquet, M.Ed., for a disability assessment in March 2001. Bousquet diagnosed Baranich with a "mood disorder due to cardiac condition with mixed features," "somatoform disorder not otherwise specified," dependence on Xanax, and generalized anxiety disorder. He concluded that Baranich would have difficulties dealing with stress and pressure associated with daily work, would experience an exacerbation of his anxiety under stress and pressure, and would have trouble maintaining his attention and concentration. However, Bousquet also concluded that Baranich could relate effectively with other

workers and supervisors and follow directions.

Rod Coffman, Ph.D., reviewed Baranich's medical records in April 2001. He found that Baranich had an anxiety-related disorder, somatoform disorder, and a substance addiction. Dr. Coffman concluded that Baranich "should be capable of completing simple tasks in a low-stress environment with little public interaction."

C.

At the hearing, Baranich testified that he completed high school and worked as a coal miner for twenty-eight years. He stopped working in May 1999, because the coal mine at which he worked closed. For the next two years, Baranich went through vocational training and studied the automotive, welding, construction, and electronics trades. He obtained certification in these trades.

He testified that he suffers from some chest pain on a normal day and that the chest pain increases with stress or exertion. He also testified about dizziness, numbness, and anxiety. He stated that he has to sit down often and lie down around lunch and in the late afternoon.

Baranich testified that he could not do a job working with other people, with stress, where there was exposure to heat, cold, or fumes, or that required standing in one place. He further stated that he lost his breath walking to his mailbox, that he could walk one city block at a time, and that he could sit for a half an hour before his back tightened up and his leg became numb.

Upon questioning by the ALJ, Baranich admitted going deer hunting twice in fall 2001. He also testified that he was active in the Eagles and the American Legion.

Sharon Baranich, Baranich's wife, also testified at his hearing. She stated that he suffered from a lot of chest pain and would turn clammy and get sweaty when the chest pain increased. She

also indicated that Baranich complained of nausea and dizziness, was frequently worried, and suffered panic attacks.

Timothy Mahler testified as the independent vocational expert ("VE"). The ALJ posed a hypothetical to the VE, assuming an individual

> approaching advanced age with a high school education, ability to read and write, additional vocational certificates, precluded from performing all but light work with a sit/stand option, no repetitive bending, no hazards such as dangerous and moving machinery, work at unprotected heights, controlled environment, that is free of excessive dust, fumes, pollutants, finally, unskilled low stress work, low stress defined as one and two step processes, primarily working with things rather than people, routine and repetitive tasks entry level.

The ALJ asked if any work would be available to such an individual. The VE listed jobs such as an inspector checker, laundry folder, hand packer, and assembler in small products. These types of jobs were available in the local and national economy. The VE stated that his conclusions were consistent with the Department of Labor's *Dictionary of Occupational Titles* (DOT), except that the DOT does not state whether jobs have a sit/stand option. However, he stated that based on his twenty-two years of experience placing disabled individuals, these jobs typically offer a sit or stand option.

## D.

The ALJ determined that Baranich was not disabled. Specifically, the ALJ concluded that Baranich's impairments were not severe enough to meet or medically equal the impairments listed in the regulations. He stated, "Neither the claimant's treating cardiologist nor the state agency medical consultant believes the claimant's coronary artery disease is sufficiently severe to meet or equal any cardiac listings. . . . Likewise the claimant's anxiety is not of listing-level severity." The

ALJ then determined that Baranich retained the ability to perform light work. Further, based upon the VE's testimony, the ALJ concluded that Baranich "is capable of making a vocational adjustment to work that exists in significant numbers in the national economy."

Baranich appealed to the Appeals Council. The Appeals Council denied his request for review, rendering the ALJ's decision the final decision of the Commissioner of Social Security.

Baranich sought judicial review of the Commissioner's decision pursuant to 42 U.S.C. § 405(g). The district court affirmed the decision. Baranich appealed to this court.[2]

II.

When reviewing the Commissioner's decision as to whether an individual is disabled, this court can only assess whether substantial evidence in the record supports the ALJ's determination and whether the ALJ followed the proper legal standards. *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997). Substantial evidence means "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). The Commissioner's findings are not subject to reversal "merely because there exists in the record substantial evidence to support a different conclusion." *Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001). The court may not review the case *de novo*, resolve conflicts in evidence, or decide questions of credibility. *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

III.

---

[2]John Baranich passed away after his appeal was filed in this court. Sharon Baranich, his widow, is substituted on appeal as the administratrix of his estate.

*Baranich v. Barnhart*, No. 04-3461

Baranich raises a number of issues on appeal with respect to how the ALJ conducted the hearing and the conclusions reached by the ALJ. Despite Baranich's contentions, we conclude that the ALJ's findings were supported by substantial evidence.

A.

Baranich first contests the ALJ's formulation of the hypothetical. Baranich argues that the ALJ did not incorporate into the hypothetical Baranich's limitations with respect to difficulties maintaining concentration when performing simple tasks, persistence, and punctuality. Further, he contends that medical evidence does not support that he could perform a job with a sit/stand option.

"Substantial evidence may be produced through reliance on the testimony of a vocational expert in response to a 'hypothetical' question, but only 'if the question accurately portrays [the claimant's] individual physical and mental impairments.'" *Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987) (quoting *Podedworny v. Harris*, 745 F.2d 210, 218 (3d Cir. 1984)). In this case, the hypothetical accurately portrayed Baranich's limitations. With respect to Baranich's difficulties maintaining concentration and persistence, Dr. Coffman's assessment found that Baranich displayed moderate limitations in ability to maintain concentration, persistence, or pace, but that he "should be capable of completing simple tasks in a low-stress environment with little public interaction." This conclusion was incorporated into the hypothetical. Additionally, none of the reviewing physicians determined that he had a problem with punctuality, and therefore this alleged limitation was properly excluded from the hypothetical. With respect to the sit/stand

option,[3] while Baranich may have suffered from lightheadedness, numbness, dizziness, and fatigue, the ALJ properly determined that these limitations were not so disabling as to prevent Baranich from performing a job with a sit/stand option. No physician ever concluded that these limitations would prevent Baranich from working or performing less demanding tasks, as he was only restricted by his physicians from lifting heavy objects, mowing the lawn, and doing other physically challenging endeavors. Further, after his bypass surgery, Baranich returned to work at the coal mine, attended vocational school, hunted, and socialized at the American Legion and Eagles. The ALJ's formulation of the hypothetical thus accurately portrayed the limitations faced by Baranich and incorporated those impairments that would impact his ability to work.

### B.

Next, Baranich challenges the ALJ's assessment of his residual functional capacity. He argues that the ALJ erred in not fully giving credit to his allegations of disabling symptoms stemming from physical and mental impairments.

As a preliminary matter, Baranich argues that the ALJ erred in not following the framework established by *Duncan v. Secretary of Health & Human Services*, 801 F.2d 847 (6th Cir. 1986).

---

[3]Baranich also argues that the sit/stand option should not have been included in the hypothetical, because information about whether jobs allow a sit/stand option is not contained in the *Dictionary of Occupational Titles*. However, the VE is permitted to rely on sources other than the DOT in evaluating a hypothetical. *See* 20 C.F.R. § 404.1566(d). In *Barker v. Shalala*, 40 F.3d 789, 795 (6th Cir. 1994), this court rejected the plaintiff's argument that "only the *Dictionary of Occupational Titles* can be used as a basis for defining the characteristics of jobs occurring in the national economy." *Barker* concluded that "[i]t would be manifestly inappropriate to make the *Dictionary of Occupational Titles* the sole source of evidence concerning gainful employment." *Id.* Baranich is therefore incorrect to argue that the ALJ could not include a sit/stand option when such an option is not indicated in the DOT, as the DOT is only one source to be used in assessing the availability of jobs for the claimant.

Baranich's contention is without merit. *Duncan* requires a claimant complaining of subjective symptoms to first show that there is objective medical evidence of an underlying condition. *Id.* at 853. If objective medical evidence exists, the court must then examine whether objective evidence confirms the severity of the alleged symptoms or whether the medical condition is of such severity that it can reasonably be expected to produce such symptoms. *Id.* In assessing Baranich's residual functional capacity, the ALJ explicitly stated that he was following the "requirements of 20 C.F.R. § 404.1529 and Social Security Ruling 96-7p." These provisions govern the evaluation of subjective medical complaints. In particular, "[w]hen the medical signs or laboratory findings show that you have a medically determinable impairment(s) that could reasonably be expected to produce your symptoms, . . . we must then evaluate the intensity and persistence of your symptoms." 20 C.F.R. § 404.1529(c)(1). As this court has recognized, this analysis is not markedly different than the *Duncan* analysis. *See McCoy v. Chater*, 81 F.3d 44, 47 (6th Cir. 1995) (concluding that the most recent version of 20 C.F.R. § 404.1529 is "in no way . . . inconsistent with the standards applied by this court" in *Duncan*). The ALJ did not commit error in failing to explicitly follow *Duncan*.

In determining Baranich's residual functional capacity, the ALJ concluded that Baranich had serious heart disease and a history of anxiety. The ALJ then determined that Baranich's allegations concerning his symptoms were generally, but not totally, credible.

On appeal, Baranich argues that the ALJ did not take into account or credit evidence of his subjective symptoms, including fatigue, weakness, chest pain, dizziness, nausea, and headache. However, "an ALJ is not required to accept a claimant's subjective complaints and may properly consider the credibility of a claimant when making a determination of disability." *Jones v. Comm'r*

*of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003). In this case, substantial evidence supports the ALJ's decision not to fully credit Baranich's complaints about his subjective impairments and their effects on his ability to work. After his bypass surgery, Baranich returned to work at the coal mine, obtained certification in four trades, hunted, and attended meetings at the American Legion and Eagles. *See Bogle v. Sullivan*, 998 F.2d 342, 348 (6th Cir. 1993) ("The ALJ may consider the household and social activities in evaluating complaints of disabling pain or other symptoms."). Additionally, the physicians who evaluated Baranich never concluded that his symptoms were totally disabling. In March 1999, Dr. Noble placed "no specific restrictions" on Baranich's return to work; in 2002, Dr. Noble only indicated that Baranich should not do a job requiring as much effort as coal mining. Dr. Starr concluded that Baranich would have some restriction on lifting heavy objects, but could otherwise stand and walk normally, exercise, and perform chores with little difficulty. Substantial evidence supports the ALJ's decision to not fully credit Baranich's complaints.

Baranich also disputes the ALJ's conclusion that Baranich did well on stress tests, the ALJ's statement that he did not take nitroglycerin for his angina, and the ALJ's observation that he was not in treatment for anxiety. However, these conclusions are more than adequately supported by his medical records. The results of his stress tests were described as either benign or fine and were interpreted as showing normal exercise capacity. Baranich also did not take his nitroglycerin on a regular basis. While this may have been because he suffered headaches when taking the medication, the record also reflects that after his angioplasty, he suffered no chest pain for which he would need to use it. As Dr. Hedges observed in April 2001, Baranich "has not had any chest pain and has no

need to use the Nitroglycerin." Finally, the ALJ correctly observed that Baranich was not receiving treatment for his anxiety, despite the fact that he could have done so at the VA Clinic.

Next, Baranich states that his hiatal hernia, back problems, and right leg numbness should have been considered by the ALJ. The ALJ specifically referenced Baranich's chronic back pain in his decision. The ALJ did not discuss Baranich's hiatal hernia, which Baranich only briefly discussed in his testimony. However, the ALJ did incorporate "no repetitive bending" into the hypothetical to the VE, which presumably would eliminate jobs that would bother Baranich because of his back problems and hernia. The ALJ also did not specifically discuss Baranich's numbness. However, there was substantial evidence in the record indicating that, even if Baranich did suffer from numbness, the numbness was not so severe that it would have prevented him from working. Further, while the ALJ is required to develop the record, the "ALJ is not required to discuss all the evidence submitted." *Craig v. Apfel*, 212 F.3d 433, 436 (8th Cir. 2000).

Baranich also argues that the ALJ did not credit the testimony of Sharon Baranich. The ALJ did not err in this respect. The ALJ did not reject Mrs. Baranich's testimony, but rather observed that it corroborated his subjective complaints. Further, the ALJ is not required to extensively discuss all the evidence submitted. *Id.* ("Although required to develop the record fully and fairly, an ALJ is not required to discuss all the evidence submitted, and an ALJ's failure to cite specific evidence does not indicate that it was not considered."). The record reflects that the ALJ considered Mrs. Baranich's testimony and incorporated it into the decision-making process.

Finally, Baranich claims that the ALJ erred in failing to consider the combination of his impairments in setting his residual functional capacity. This contention is erroneous, as the ALJ

indicated in his findings that he considered the "combination of impairments" suffered by Baranich to be severe. Further, the hypothetical posed to the VE combined many of Baranich's impairments, including his anxiety and cardiac condition, and requirements, including being free from pollutants, the ability to sit or stand, and no repetitive bending.

We conclude that the ALJ's assessment of Baranich's subjective symptoms and residual functional capacity was supported by substantial evidence.

C.

Baranich next contends that Dr. Noble concluded that his cardiac condition met the listings. Under the Social Security regulations, "[i]f a claimant is not doing substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997) (citing 20 C.F.R. § 404.1520). The ALJ determined that Baranich's cardiac conditions were not of listing-level severity. In reaching this conclusion, he observed, "Neither the claimant's treating cardiologist nor the state agency medical consultant believes the claimant's coronary artery disease is sufficiently severe to meet or equal any cardiac listings."

Before this court, Baranich argues that Dr. Noble implied that the listings were equaled with respect to his cardiac condition. He references a letter from Dr. Noble, which states as follows.

> By the social security listings for cardiovascular impairment under (C), there is in section B then a greater than 70% narrowing of a non-bypassed coronary artery. Specifically the right coronary artery was bypassed but that bypass is occluded so there is some narrowing still in that distribution.

Contrary to Baranich's assertions, Dr. Noble's letter does not state that Baranich met the listing.

Instead, Dr. Noble correctly recites the listing requirement of a greater than 70% narrowing of a *non-bypassed* artery. *See* 20 C.F.R. § 404, Subpart P, Appx. 1. He then states that Baranich's artery has been bypassed and has some narrowing. The facts as Dr. Noble recites them in his letter indicate that Baranich has not met the listings.

D.

Finally, Baranich takes issue with the way the ALJ conducted the hearing. He argues that the ALJ improperly restricted his cross-examination of the VE and also wasted time and space at the hearing and in the decision on non-disputed issues.

A review of the hearing transcript shows that the ALJ did not prevent Baranich's attorney from questioning the VE. Rather, the ALJ asked Baranich's attorney to rephrase a question. The attorney did not attempt to restate the question and instead abandoned all questioning. His failure to continue cross-examination resulted from his own decision and not from a directive of the ALJ.

Next, Baranich complains that the ALJ wasted time at the hearing by reconsidering Stages 1, 2, and 4 of the five-step sequential analysis set forth in 20 C.F.R. § 404.1520. He argues that 20 C.F.R. § 404.946 limits issues heard at hearing to issues not previously decided in the claimant's favor. Additionally, Baranich contends that the ALJ's decision was too short and wasted space on "boilerplate definitions from the law and the act" instead of addressing "live issues."

Baranich's contentions with respect to how the ALJ approached his case are without merit. The ALJ followed the appropriate legal analysis set forth in 20 C.F.R. § 404.1520 in reviewing Baranich's claim. That the ALJ also briefly reviewed certain undisputed steps of that legal analysis does not render the ALJ's decision-making process infirm.

IV.

For the foregoing reasons, we conclude that the ALJ's decision was supported by substantial evidence and affirm the decision of the district court.